IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

- - - - - - - - - - - - - - - x
IN RE:                          :
                                :
DEBRA NORMAN GUTSHALL,          :  Case No. 10-03429-8C7
                                :  Chapter 7
              Debtor     :
- - - - - - - - - - - - - - - x
STEPHEN L. MEININGER,           :
                    Plaintiff :
      VS                        :  Adversary No. 10-00977
CHASE BANK, N.A.,               :
              Defendant :
- - - - - - - - - - - - - - - x
                                U.S. Courthouse
                                801 N. Florida Avenue
                                Tampa, Florida
                                July 12, 2011
                                3:35 P.M.


                    HEARING

1) Plaintiff's Motion for Summary Judgment

2) Motion for Partial Summary Judgment by Defendant



        BEFORE THE HONORABLE CATHERINE PEEK MCEWEN
              UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For Stephen Meininger
Chapter 7 Trustee:              GUS CENTRONE, Esquire

For the Chase Bank, NA:         ROBERT QUINN, Esquire


_____
                JOHNSON TRANSCRIPTION SERVICE
                  7702 Lake Cypress Drive
                  Odessa, Florida  33556
                    (813) 920-1466

P R O C E E D I N G S

1

2          COURTROOM DEPUTY:  Debra Norman Gutshall, 10-3429,

3    Adversary 10-977.

4          THE COURT:  All right.  The Court will take

5    appearances.

6          MR. CENTRONE:  Good afternoon, Your Honor, Gus

7    Centrone from Lash & Wilcox, special counsel to the Trustee.

8          THE COURT:  All right.  Thank you.

9          MR. QUINN:  Good afternoon, Your Honor, Robert Quinn,

10   Carlton Fields, representing Chase Bank USA, N.A.

11         THE COURT:  All right.  Thank you.

12         And in the back I note the observer, Ms. Amanda

13   Chazal, who's here on behalf of Mr. Foyle's office.

14         All right.  I've looked at the papers, and we can

15   have more argument.  I can tell you what I think the papers

16   show and you can maybe try to shake me off of that.  Maybe that

17   would be the most efficient way?

18         MR. CENTRONE:  That's probably correct, Your Honor.

19         THE COURT:  Okay.  The complaint in this action

20   alleges violation of two subsections of the Florida Consumer

21   Protection Practices Act, namely, 559.72 Subsection (17) and

22   Subsection (18) of the Florida Statutes.  We're not dealing

23   with harassment subsections; we're dealing solely with those

24   two.

25         Subsection (17) prohibits making contact with a

consumer debtor during certain hours.  I see a dispute of fact

in the record on that.  I have an affidavit from the Debtor,

Ms. Gutshall, proclaiming that Chase contacted her outside of

the permitted hours.  And then I have an affidavit from Chase

saying our call records don't reflect any such calls.  And so I

think there's a fact dispute there on that one.

MR. CENTRONE:  I think you're correct, Your Honor.

THE COURT:  Now, do you disagree, Mr. Quinn?  I know

you would like for me to take your call log as best evidence,

but I really think that comes after a trial.

MR. QUINN:  Well, Your Honor, we have not moved for a

summary judgment on that issue.

THE COURT:  Okay.

MR. QUINN:  We just said there was a fact dispute.

THE COURT:  Well, I think you have rebutted the

assertion that there is no genuine issue of material fact as to

Subsection (17).

Then we have Subsection (18) which has to do with

prohibiting contact after a consumer debtor has informed the

lender that the consumer debtor is represented by counsel

concerning, and I'll quote from the statute, open quote, "such

debt," close quote.

And here's where I see a dispute of fact.  Ms.

Gutshall says, although she doesn't say a date in her

affidavit, she says she informed Chase that she was represented

1  by Ms. Lopez, Anett Lopez, and Chase's affidavit apparently

2  puts that date at October the 15th.  The affidavit of Ms.

3  Gutshall says that she told Chase that the attorney was

4  representing her with respect to the, capital "A," Alleged,

5  capital "D," Debt.  And by definition, that's both accounts.

6         Chase's affidavit indicates that, according to its

7  notes, the October 15th call only dealt with Account 0433, but

8  not the second account, which is 8731.  It was only a later

9  call, Chase concedes, November the 12th, that the 8731 account

10  information was flagged with the indication that Ms. Lopez was

11  representing Ms. Gutshall in a bankruptcy case -- in a

12  bankruptcy case.

13         The reason I think that there's a fact question is

14  Ms. Gutshall's affidavit implies that she told Chase about both

15  accounts on the October 15th call.  That's a fact dispute.

16         The affidavit does not say that during the first call

17  that the attorney was representing Ms. Gutshall with respect to

18  bankruptcy.  So with respect to the legal ruling, my leaning is

19  to say that the -- based on the case law that Mr. Quinn has

20  cited to the Court, that the statute should be given its plain

21  meaning, that the attorney has to be retained to represent the

22  Debtor concerning, quote, "such debt," close quote, meaning the

23  specific debt that's at issue, and somehow they have to know

24  about that.

25         So either Ms. Gutshall said in the October 15th call

1  that the lawyer was representing her concerning both calls or,

2  alternatively, she had to say she was filing bankruptcy and

3  this lady, Ms. Lopez, was retained to file bankruptcy.  And

4  using the case law that Mr. Quinn cited, in the absence of a

5  bankruptcy notification, I agree that you have to use the

6  specific debt when you're talking to the collector.

7         If you're talking to the collector and you've

8  retained an attorney to file a bankruptcy, then such debt is

9  within the -- is a subset of the universe of all of the debts

10  that the lawyer is being engaged to handle.  And so if the

11  information is, "I'm filing bankruptcy," then that lawyer is

12  engaged to do something concerning that debt, meaning, get it

13  discharged, and all debts is part of it.

14         If there's not a bankruptcy, then you have to tell

15  the collector, "I have an attorney regarding Account A and I

16  have an attorney, the same one, regarding Account B.  And so

17  there's a dispute of fact about what was said in the October

18  15th call.

19         MR. CENTRONE:  Can I address that, Your Honor?

20         THE COURT:  That's what I'm -- that's my leaning.

21  Yes, you may.

22         MR. CENTRONE:  And just to clarify your position that

23  if she said, "I'm filing bankruptcy, I have an attorney for

24  filing bankruptcy," that it encompasses all debts.

25         THE COURT:  Including such debt.  Because you don't

1   file bankruptcy on select debts; you file bankruptcy to

2   discharge all of your debts existent at the time of the

3   petition.  The debts would have been existent at any time a

4   petition was filed subsequent to October the 15th or November

5   the 12th.

6          MR. CENTRONE:  I have two points to address that,

7   Your Honor.  Number 1, I think that it may be a little

8   academic, because in all of these instances, except for one,

9   all of the communications after the Debtor said on October 15th

10  with respect to Account 0433, "I have an attorney," all of the

11  communications after that, save one, were on that same account,

12  were all related to the 0433 account, not the 8731 account.

13  And I can go through, Your Honor, line by line and show you in

14  the call logs why that is if Your Honor would like.

15         THE COURT:  So you're saying that -- well, the Chase

16  Corbino declaration says:  All outbound calls on 0433 ceased

17  after October the 15th.

18         MR. CENTRONE:  That is not correct, Your Honor.  If

19  you like, I can show you page by page why --

20         THE COURT:  Yes.  Let me get there.  Hold on.

21         Is this going to be a surprise to you, Mr. Quinn?

22         MR. QUINN:  I don't think so, Your Honor.  I think

23  you're reading it right and he's reading it wrong, but we'll

24  wait to see.  If it turns out that he's got it right, then it

25  may be a surprise and I'll see what I can do.

1          THE COURT:  Okay.  Let me go to --

2          MR. QUINN:  I'm sorry.  No, there were calls on 0433

3  after October 15.  There were no calls on 8731 after October 9.

4          MR. CENTRONE:  And I would disagree with that to the

5  extent there was --

6          THE COURT:  Wait a minute.

7          MR. CENTRONE:  -- I got one call.

8          MR. QUINN:  One inbound call.

9          MR. CENTRONE:  One communication.

10          MR. QUINN:  One inbound call.

11          THE COURT:  Well, I'm reading at Page 17 of the memo

12  by Chase, and it says at the first full paragraph:

13  Additionally, with respect to the 0433 account, on October 15,

14  2009, an advisor added attorney Anett Lopez's name and number

15  to the records for that account which caused all outbound calls

16  on that account to cease.

17          MR. QUINN:  Well, it did, but you have to keep

18  reading.

19          THE COURT:  It says that they called Ms. Lopez.

20          MR. QUINN:  Right.  And October 27, they reached that

21  third party or agency, which would have been Ms. Lopez.  That's

22  the only number she had.  Next sentence, spoke to someone.  And

23  as a result of that call, they returned this account to

24  collections the next day.

25          MR. CENTRONE:  And continued calling --

1          MR. QUINN:  And then calls resumed, although they

2   didn't speak to anyone until November 12th.

3          THE COURT:  Okay.  So there was a call after the

4   fact.

5          MR. QUINN:  Right.  After the initial

6   communication --

7          THE COURT:  Well, why did they put the account back

8   into collections?

9          MR. QUINN:  Well, Your Honor, we're not sure.  We

10  don't have a good explanation for that other than when they did

11  contact Ms. Lopez's office and speak to them on October 27th,

12  whatever information that collector received caused that

13  collector to return it, put Ms. -- put the -- on October 12th

14  -- October 15, they took out Mrs. -- or Ms. Gutshall's home

15  phone and business number out of the system and put in Ms.

16  Lopez's number, began calling Ms. Lopez.

17         On October 27, they spoke to someone at the third-

18  party agency, and that collector made the note they spoke to

19  that third party, took out Ms. Lopez's number and put back in

20  for calls.  And so the calls started the next day to Ms.

21  Gutshall.

22         THE COURT:  Okay.  Well, then, what defense does

23  Chase offer for calling Ms. Gutshall after the Account 0433 was

24  noted with the fact that Anett Lopez represents her on that

25  account?

1          MR. QUINN:  Well, the information according to

2   Chase's notes were that on October 15, the card member had

3   declared Chapter -- not had, but declared -- with a "d," past

4   tense -- Chapter 7 bankruptcy, Anett Lopez (727)844-5209.

5          They didn't actually file bankruptcy until five

6   months later, February of 2010.  So we think it's a reasonable

7   inference that the contact to Ms. Lopez's office indicated that

8   she wasn't representing them.  That's the only reason we can

9   come up with, other than a crazy rogue agent who decided to

10  just stick it back on the file after having taken it off.

11         One took it off because of information about an

12  attorney, calls to the attorney, contact with the attorney's

13  office, which seems to fit, since they didn't file until

14  February, inconsistent, declared Chapter 7, Ms. Lopez, is the

15  note we have.  Perhaps Ms. Lopez' office said, "We don't

16  represent them."

17         MR. CENTRONE:  Your Honor --

18         MR. QUINN:  That's the only inference we have.

19         THE COURT:  But that's your duty to rebut that in

20  the record.

21         MR. QUINN:  Well, all we have is that for whatever

22  reason, by inference, that collector, although trained not to

23  call if there's an attorney, something in the call to the

24  attorney's office led them to believe there wasn't an attorney.

25  But that's all we have in our record, that it came out

1  properly, calls were made to the third party.  When they

2  actually spoke to someone at the third-party agency, the law

3  firm, they took the attorney's number off and put in the other.

4          THE COURT:  But they're not allowed to do that.

5          MR. QUINN:  They're not -- unless what they're told

6  is, "We don't represent them."

7          THE COURT:  But you don't have anything that creates

8  that fact dispute in this record.

9          MR. QUINN:  Other than the inference of the training

10  of the people, what they're supposed to do, and that the calls

11  were properly switched over to the attorney only, when they

12  made contact with the attorney the first time, switched them

13  right back, and the indisputable fact that they hadn't declared

14  bankruptcy.  In fact, they didn't do it until five months

15  later.

16          THE COURT:  That's not unusual.

17          MR. QUINN:  Five months?

18          THE COURT:  No, not at all.

19          MR. QUINN:  Okay.

20          THE COURT:  Because sometimes the attorney fee takes

21  a little while to stockpile.

22          MR. QUINN:  Well, I assume so.  But are they

23  represented until they get the money up?  I doubt it.

24          THE COURT:  They've got an attorney-client

25  relationship.  They're supposed to be filling out forms and

1  gathering information.  And the smart attorneys don't file the

2  petition until they get every penny of their retainer, because

3  if they don't, as you know, then the attorney-fee obligation

4  would be discharged.

5       There is also some, I'll say this in a polite way,

6  gamesmanship with the means test.  If someone gets an

7  extraordinary bonus, for example, one that's not a regularly

8  recurring bonus, one that may not be expected again in another

9  year, then the time passage would aid the debtor in showing a

10  more true picture of the net disposable income for purposes of

11  the means test.  So there are reasons why people delay.  And I

12  don't think that that --

13       MR. QUINN:  Well, it could be evidence of a bona fide

14  error, Your Honor, because the person -- we did it right the

15  first time.  There were calls.  They made a contact.  Something

16  in the call caused the person to think they're supposed -- it

17  was okay to start calling again.  And then we only called for

18  15 days, and we only spoke to Ms. Gutshall once.  And when she

19  repeated it again on November 12th, again on the same account,

20  that Ms. Lopez represented her and she was going to file

21  bankruptcy, her phone numbers came out, they were taken out,

22  and Ms. Lopez's phone number was put in.  And nobody called her

23  again on this account.

24       Now, there was an account call on the same day -- I

25  thought it was an inbound account but I could be mistaken -- on

1   the other account, 8731.  There was one call on 8731 on 11/12.

2         THE COURT:  Okay.  So you're saying that the

3   information regarding the training provides an interest that

4   there must have been a mistake.

5         MR. QUINN:  At worst.  Or perhaps --

6         THE COURT:  Okay.  And what is the -- one thing I'm

7   not really -- I don't have a great grip on is the bona fide

8   mistake defense.  I know that there's been some traffic at the

9   federal level concerning the FDCPA and I know that that case

10  law is persuasive with respect to similarly worded provisions

11  in the FCCPA.  But what's the latest on the bona fide error?

12  Does it pertain to mistakes of law?

13        MR. QUINN:  Sorry, it does not, Your Honor.  The 11th

14  Circuit said, and maybe even the Supreme Court said:  Mistake

15  of law, too bad for you, creditor.  It has to be a mistake of

16  fact, such as --

17        THE COURT:  Mistake of fact.

18        MR. QUINN:  -- perhaps:  Oh, you don't represent Ms.

19  Gutshall.  That could be a mistake.  That would be a mistake of

20  fact not -- Your Honor, although we think bankruptcy is not

21  representation as to such debt, I understand Your Honor thinks

22  bankruptcy covers all debts to include such debt.  I understand

23  that position.

24        THE COURT:  It has to.

25        MR. QUINN:  Well, okay.  All right.  So that would be

1    a mistake of law of our view --

2             THE COURT:  Correct.

3             MR. QUINN:  -- if that's why we're doing it.  But we

4    say the inference is based on they took it out properly.  You

5    know, they didn't not call the lawyer.

6             THE COURT:  Okay.

7             MR. QUINN:  They called the lawyer --

8             THE COURT:  Okay.  So do you concur it only deals

9    with -- it deals with mistakes of fact, the bona fide error

10   defense?

11            MR. CENTRONE:  Correct, Your Honor.  Although I would

12   clarify by also saying that the German case, the Supreme Court

13   case we were just discussing, relates to clerical errors, not

14   all human errors.

15            A couple of points, Your Honor.  First, Chase

16   subpoenaed the retainer agreement between --

17            THE COURT:  I saw that.

18            MR. CENTRONE:  -- Ms. Lopez and Ms. Gutshall.

19            THE COURT:  It says September the 9th.

20            MR. CENTRONE:  And it says September, prior to any of

21   this.  And it talks about the retainer having been -- that

22   there was an initial nonrefundable fee retainer given.

23            Second, even if they -- they gave the -- Ms. Gutshall

24   gave her attorney's info for the first time on October 15th.

25   She again gave it on October -- excuse me -- November 12th

1  after about seven messages in between.  They called again six

2  minutes later, and she said, and this is from their account

3  notes:  Customer said we just called her and is filing

4  bankruptcy --

5          THE COURT:  Slow down.  Ms. Taylor is taking this

6  verbatim, remember?

7          MR. CENTRONE:  I apologize, Your Honor.

8          Customer said we just called her and is filing

9  bankruptcy.  Please see other notes from today.

10          There was additional calls.  And they called again

11  after that in February of 2010 and left a message.  There is no

12  bona fide error.  A bona fide error might -- I mean, maybe

13  there's a case that it's once or twice.  But here we -- by my

14  count there was more than 97 attempts to call.  There were

15  seven messages left and they spoke to her two more times

16  between October 15th and February 8th.

17          THE COURT:  Well, let's go to what happened after

18  November 12th.  How many?

19          MR. CENTRONE:  There was numerous attempts, but I see

20  one message left, which is on February 8th at 4:24 p.m.

21          THE COURT:  Okay.  Mr. Quinn, what about that one?

22  After November 12th, it's clear that Chase knew what was going

23  on with respect to both accounts.

24          MR. QUINN:  Well, yes, Your Honor.  But I think my

25  opposing counsel is misinterpreting the call logs and he should

1 refer to the affidavit.

2          THE COURT:  Okay.  Let me go to that.  One moment.

3 Is that Exhibit 1?  Wait a minute.  Hold on.

4          MR. QUINN:  Well, actually, Your Honor, it's Document

5 33.  Page 11 of the affidavit begins --

6          THE COURT:  Oh, it's the standalone.  All right.

7 Hold on.  That's the Corbino affidavit.  And then which

8 exhibit?

9          MR. QUINN:  Well, Your Honor, first you have to look

10 at his explanation of what the dialer logs mean, Page 11.

11          THE COURT:  Oh, you mean with the codes?

12          MR. QUINN:  Right.  He's interpreting what they are.

13 And he starts at Paragraph 48.

14          THE COURT:  Okay.  I'm there.

15          MR. QUINN:  October 15 Ms. Gutshall called in.

16 Called in, that means she called us.  And they wrote down the

17 name and phone number.  She had declared bankruptcy.  Did not

18 reflect the case number.  Recording of the attorney's name and

19 number ceased outbound calls.  After October 15, attempted to

20 call a third party.  October 27 they called her and made the

21 change; we don't know why.

22          Following that, Your Honor, between October 28th,

23 when they started the calls again after they spoke to Ms.

24 Lopez's office, on November 11th, 57 call attempts occurred.

25 On none of these occasions did Chase reach Ms. Gutshall.

1        On November 12th, they did reach Ms. Gutshall by an

2   outbound call.  She said, again -- this time she said:  Is

3   filing bankruptcy -- or at least they wrote down:  Is filing

4   bankruptcy.

5        THE COURT:  Well, apparently there's something about

6   bankruptcy even in the October 15th call.

7        MR. QUINN:  Yes.  Yes.  It was.  And then they called

8   Ms. Lopez's office for two weeks and they got through on

9   October 27.  And for some reason we don't know, the collector

10  who spoke to Ms. Lopez's office put the other two phone numbers

11  back in so the calls would resume.

12        THE COURT:  Okay.  So what happens then after

13  November the 12th?

14        MR. QUINN:  Your Honor, on November 12th, again, the

15  collector removed -- if you go to the following page --

16        THE COURT:  I'm reading it.

17        MR. QUINN:  -- on Page 13, Paragraph 50, Chase

18  removed the home numbers --

19        THE COURT:  And that's consistent with your memo of

20  law.

21        MR. QUINN:  Right.  Chase removed the home numbers

22  from November 12th.  There were no new -- no phone numbers in

23  the system to call Ms. Gutshall at home after November 12th.

24  The calls after November 12th would have been to either Ms.

25  Lopez's offices or -- the other things listed in the call log

1  are not actually calls, just computer service on the system.

2        THE COURT:  So Paragraph 52 says, and this is part of

3  the affidavit, that attempts would not have been to Ms.

4  Gutshall's.

5        MR. QUINN:  Right; because her phone numbers are

6  actually removed from the system and a zero value put in there.

7  The only phone number in the system after November 12th is Ms.

8  Lopez.  Any calls going out by the system after that would only

9  go to Ms. Lopez.

10        Then January 31 it's charged off, and there's no

11  calls after that.  So we do have the issue of whether or not

12  whatever communication with Ms. Lopez's office was enough of

13  either a confusion or actually a statement of:  We don't

14  represent them.  That inference, based on the training, to say

15  that either they had -- they were legitimately allowed to start

16  calling again or the collector made an --

17        THE COURT:  That's only with respect to the calls

18  between October the 15th and November the 12th.

19        MR. QUINN:  Right.  And there are only calls from

20  October 28th to November 12th because they stop.  They only go

21  -- from October 15 to October 27, they only go to Ms. Lopez's

22  phone number.  They speak to someone at Ms. Lopez's office on

23  October 27th, the next day calls start again to Ms. Gutshall.

24  The first time they speak to someone is November 12th and the

25  calls stop.

1          Now, there's one other call on the other account on

2     the same date within minutes.  I thought it might be an inbound

3     call, but perhaps not.  But that's on the separate account.

4     And that's because they stopped the calls that day.  They don't

5     go on the next --

6          THE COURT:  Okay.  Mr. Centrone, there's a dispute of

7     fact on that because the affiant at Chase has said that we

8     didn't call those numbers.

9          MR. CENTRONE:  I would disagree with that, Your

10    Honor, because their own records disagree with that.

11         THE COURT:  Okay.  Which exhibit?

12         MR. CENTRONE:  If I could have the opportunity to

13    also start from the beginning and get there the way Mr. Quinn

14    did?

15         She tells them on October 15th --

16         THE COURT:  Well, look, let's point to what is in the

17    record you're referring to.

18         MR. CENTRONE:  Sure.  As to that February 8th call,

19    on --

20         THE COURT:  February 8th?

21         MR. CENTRONE:  February 8th, which is after the

22    November -- after everything.  They leave a message.

23         THE COURT:  Right.

24         MR. CENTRONE:  Now, there are numerous attempts --

25    and by the way, I'm looking at Doc. 20, Exhibit 3.

1          THE COURT:  Hold on.

2          MR. CENTRONE:  Sure.

3          THE COURT:  This is in your filing.  This is not one

4    of their filings.

5          MR. CENTRONE:  Correct.  Even without the declaration

6    of the Debtor, Your Honor, their records prove our case.

7          THE COURT:  Okay.  What do I -- I'm at this exhibit.

8          MR. CENTRONE:  The page marked Chase -- at the

9    bottom, Chase-Gutshall 000168.

10         MR. QUINN:  Sorry, mine have holes in it.  What's the

11   page --

12         MR. CENTRONE:  Page 25 is the --

13         MR. QUINN:  Court filing?

14         THE COURT:  Well, mine says 107, there's 106, there's

15   14, and there's 13.  That's Exhibit B.  What did you tell me?

16         MR. CENTRONE:  It's marked Doc. 20-3.  So I think

17   that would be Exhibit C.

18         THE COURT:  Okay.  I was in the wrong one.  Okay,

19   158, that's what you want me to be in?

20         MR. CENTRONE:  168 -- Chase-Gutshall 168.

21         THE COURT:  That is also marked at the bottom Page

22   25?

23         MR. CENTRONE:  Correct.

24         THE COURT:  Okay.  I'm there.

25         MR. CENTRONE:  The third entry from the bottom is

1  Account Number 0433.  Do you see the date February 8th, 2010?

2          THE COURT:  Yes.

3          MR. CENTRONE:  The time is 4:14 and 50 seconds.  They

4  were calling home and left a message.  If there were no numbers

5  in the system, how could they have called her home and left a

6  message?

7          THE COURT:  I don't know, but some affiant says

8  that's not the case.

9          MR. CENTRONE:  But he's speculating.

10          THE COURT:  That's not what he said.

11          MR. CENTRONE:  He's saying they would not have

12  called, not that they --

13          THE COURT:  Because there were no numbers in the

14  system.  There's a fact dispute.

15          MR. CENTRONE:  Maybe as to that one call, Your Honor.

16  But the previous calls -- again, between October 15th and

17  November 12th when she first gave the attorney contact info.

18  And again, I'm only talking about --

19          THE COURT:  He says that there's an inference -- that

20  I should find an inference, that I need to construe your motion

21  against you, you know, I need to keep it tight.  And then --

22  and he's saying that that suggests an inference -- not that,

23  but the fact that the training suggests an inference that a

24  bona fide mistake was made.

25          MR. CENTRONE:  Well, Your Honor, I'd be happy to walk

1  you through the bona fide error defense, because I actually had

2  to learn about this myself for this case.  There are three

3  elements for a bona fide error.  First, that the violation was

4  not intentional, which is a subjective standard of did they

5  mean to violate the law.  Did they intend to violate the

6  statute, not did they intend to take the action.

7      THE COURT:  Okay.

8      MR. CENTRONE:  That's a pretty low bar to meet.

9      The second is whether there was a bona fide error,

10  not a contrived error.  And that's one of the two issues here

11  that Chase can't meet because they say there was no error.

12      THE COURT:  That's not what he's arguing now.

13      MR. CENTRONE:  Their brief says, quote, "Chase

14  followed its policies and procedures to avoid unnecessary

15  contact with Ms. Gutshall after she notified Chase that she was

16  represented by counsel," Doc. 34, Page 19.

17      If they're to say --

18      THE COURT:  Yes.  That's what I was reading from too

19  and -- let's see.

20      MR. CENTRONE:  In other words, Your Honor, to say we

21  had policies and we followed them is not what a bona fide error

22  is.

23      THE COURT:  Well, the one sentence that Mr. Quinn

24  drew my attention to was the one that's in the middle of --

25  it's on Page 17 in the middle of that first full paragraph.

1          MR. CENTRONE:  And I'm sorry, this is in their --

2          THE COURT:  Chase -- this is in Doc. Number 34 --

3    Chase spoke to someone at the agency, meaning the law firm, and

4    returned the account to collection status the next day.  It

5    would be contrary to the policy to return something to

6    collection status if a person is represented by counsel and the

7    collector so noted the record that way.  And so he's suggesting

8    that could only be because of a bona fide error.

9          MR. CENTRONE:  And that gets us to the third prong,

10   Your Honor --

11         THE COURT:  Okay.

12         MR. CENTRONE:  -- which is the -- the third prong has

13   two sub prongs:  That the error occurred despite the

14   maintenance of procedures reasonably adapted to avoid any such

15   error.

16         THE COURT:  Right.

17         MR. CENTRONE:  And there's two sub prongs.  Number 1

18   is maintenance:  Such procedures were actually employed or

19   implemented.

20         THE COURT:  And he says they were.

21         MR. CENTRONE:  And B, whether the procedures were

22   reasonably adapted to avoid the specific error at issue.  What

23   is the specific error at issue?  It's speculative.  They don't

24   know.  How could they have -- how are they going to point to a

25   policy about something that happened when they don't even know

1  what happened?  And that a policy about training is -- first of

2  all --

3           THE COURT:  They may know by the time of trial.

4           MR. CENTRONE:  Maybe.

5           THE COURT:  Maybe they'll find the person that put it

6  back into the collection status and take their deposition.

7           MR. CENTRONE:  Except they don't keep records of the

8  agents who debtors talk to, so.

9           MR. QUINN:  Well, actually we do.  We've got their ID

10 number.  The chances of them remembering what they did or why

11 when they talk to hundreds or thousands of people --

12          THE COURT:  This is unusual.  You don't call an

13 attorney's office and put it back into collection.

14          MR. QUINN:  I would think that is unusual.  Maybe

15 they will remember, or maybe they'll have an explanation of "I

16 must have then because."

17          THE COURT:  Yeah.  And you know what I bet the

18 explanation is?

19          MR. QUINN:  What?

20          THE COURT:  Probably that the attorney said we're not

21 going to be filing until I receive the rest of my money, or we

22 can't file until we get the rest of the schedules.  It's not an

23 already filed bankruptcy; it hasn't happened yet.  And so that

24 person then decides, oh, well, there is no bankruptcy so I'll

25 just put it back into collection.  That would not be a bona

1  fide error.

2          MR. QUINN:  But it would be a legal mistake.

3          THE COURT:  Yes.

4          MR. QUINN:  It might be.  Well, we'll see.

5          MR. CENTRONE:  Your Honor, I see what Your Honor is

6  saying now about the bona fide error.  I don't -- I still -- I

7  don't think that their policies are reasonably adapted to avoid

8  that because I can't even point to what happened; we're

9  speculating.  I don't know if we'll ever have an answer.

10 But --

11         THE COURT:  Well, that's what trials are for.

12         MR. CENTRONE:  That's true.  That's true.  But --

13         THE COURT:  That's what trials are for and I -- you

14 know, I have to construe the record against your client --

15 against the moving party and I have to construe, I guess,

16 generously towards the non-moving party.

17         MR. CENTRONE:  I would agree with that, Your Honor,

18 with the caveat of when they present some evidence to the

19 contrary.  And all we've done here is speculate.  It could be

20 that there was a new receptionist at the law firm who said:

21 No, I don't know who that person is and we don't represent her.

22 There could have been a million things that happened; I have no

23 idea.

24         THE COURT:  And if that happened --

25         MR. CENTRONE:  But they have no evidence either way,

1  and that's the point about summary judgment.

2         THE COURT:  Mr. Quinn, turned me around when he said

3  that I can draw an inference -- a reasonable inference that

4  something weird happened in light of the intense training these

5  people get.  And, you know, you said it yourself in your brief,

6  a material fact is one that might affect the outcome of the

7  suit under the governing law.

8         And if that exists and I do say it exists by

9  inference, this may be a close call, I'd rather err on the side

10 of getting to the merits than err on making too close of a call

11 on a summary judgment motion.  So I think that the merits under

12 (17) and under (18) need to be tried.  I think there are fact

13 disputes under both.  It may be an incredible burden for Mr.

14 Quinn to carry the bona fide error day, but I've got to give

15 him the chance.

16        Now, there's -- there are a few more issues that you

17 all have teed up.  One is setoff.  Am I missing anything else

18 besides setoff?  You didn't do the standing issue; right?

19        MR. QUINN:  No, Your Honor.

20        THE COURT:  No, not this time.  That was yesterday's

21 case and Ms. Driskell was here.

22        MR. QUINN:  It depends on whether they argue penalty,

23 Your Honor.  If they argue penalty, I come back with no

24 standing.

25        THE COURT:  I gotcha.  Okay.  So it looks like we're

1  just left with the setoff argument.

2          MR. QUINN:  Right, Your Honor.  And we've moved for

3  amounts that are setoff.

4          THE COURT:  And you both have moved on that?  No, you

5  didn't move.  Mr. Quinn moved; you responded.  Okay.

6          And before I talk about that, can I ask about the

7  amended answer?  I know you moved for leave to replead when we

8  were last together.

9          MR. QUINN:  Right.

10         THE COURT:  And then you did replead.  What was added

11  or subtracted?

12         MR. QUINN:  The bona fide error defense was added.

13  That's it.

14         THE COURT:  Okay.

15         MR. QUINN:  Mr. Centrone had pointed out that we had

16  neglected to assert that the first time.

17         THE COURT:  Okay.  All right, then, I've got some

18  housekeeping for you then.  Number 1, I need to give -- I need

19  an order -- although, wait a minute.  I think you consented.

20  Did you consent?

21         MR. CENTRONE:  To their amendment?

22         THE COURT:  To allowing the amendment.  We marked

23  down an ore tenus motion to replead, so I need an order saying

24  yes, you can do that.

25         MR. QUINN:  Okay.

1          THE COURT:  And indicating you can file it by -- on

2    or before June 23rd because that's the date you filed it.

3    Okay.  And then I also need an order on your motion to strike

4    the Debra Fiola, formerly known as Debra Norman Gutshall,

5    declaration because I denied that motion at the last hearing.

6          Okay.  Now on setoff.  Does anyone want to argue

7    anything other than what you've already had in your papers?

8    Any new cases?

9          MR. CENTRONE:  I think we've both thoroughly briefed

10   it.

11         THE COURT:  Okay.  I have a question, then, to Mr.

12   Quinn.  What about this former Fifth case?

13         MR. QUINN:  Which former Fifth?

14         THE COURT:  <u>Newton</u>.

15         MR. QUINN:  Okay.  <u>Newton</u>.

16         THE COURT:  What about <u>Newton</u>?  Why am I not bound to

17   follow <u>Newton</u>, which says that debts that are discharged in

18   bankruptcy can't be held to offset a statutory penalty, relying

19   on the <u>McCollum</u> case where a bank had charged some usurious

20   interest and the Supreme Court said no, setoff was not

21   appropriate in that sense -- setting I mean?

22         MR. QUINN:  Your Honor, in <u>Newton</u> they relied on the

23   <u>McCollum</u> case which was a usury penalty case -- only a penalty

24   case.  And in <u>Newton</u> they say, well, you know, this is really a

25   penalty -- the TILA damages is a penalty, and so we should

1  follow <u>Newton</u>.

2          And they point out also, and something I don't

3  understand, that they were -- this is a TILA case, not an FCCPA

4  case or a FDCPA case.  And the reasoning they say is that you

5  -- it's a penalty and it shouldn't be allowed to be offset.  I

6  don't think necessarily they were that excited about having --

7  it having been discharged; right?

8          They say under Louisiana law the discharged debt was

9  a natural obligation which could be done.  It says there's no

10 case law about this.  The analogous case, which is <u>McCollum v.</u>

11 <u>Hamilton National Bank</u> --

12         THE COURT:  It's a very short opinion, I'll grant you

13 that.

14         MR. QUINN:  -- held that as a matter of federal law,

15 a debt discharged in bankruptcy could not be used to offset a

16 penalty imposed by a federal statute against a national bank.

17 All right?  So a discharged debt could not offset a penalty.

18 And then they go along and say, well, the TILA statutory

19 damages is a penalty.  All right.  The distinction raised by --

20         THE COURT:  Because they say it's double the -- what

21 was it?  Double the --

22         MR. QUINN:  The interest --

23         MR. CENTRONE:  The finance charge.

24         MR. QUINN:  The finance charge.

25         THE COURT:  It's an artificial damages, if you will.

1          MR. QUINN:  And they said -- Beneficial says that

2    penalties for usurious interest are not allowed to be set off

3    against claims on the underlying debt, I guess in or out of

4    bankruptcy.  It supports the position since the 1974 amendments

5    to Truth in Lending:  A party may not use as a set off in a

6    suit on the underlying debt a claim, as opposed to a judgment,

7    for the amount for which a creditor is liable under Section

8    1640(h).

9          Now, they got 1640(h) backwards.  It does say that

10   the consumer can use -- may not use a setoff on the underlying

11   debt unless it's been reduced to judgment, although it can

12   raise it as a defense in the suit on the underlying debt.  They

13   couldn't do it in there.  They got that backwards.  So the

14   holding here is, if it's a penalty -- it's a penalty -- the

15   TILA statutory damages is a penalty that cannot be offset.

16         The case law on FCCPA damages overwhelmingly is it's

17   not a penalty.  It's part penalty, part liquidated damages.

18   And it's more like a liquidated damage than a penalty.  So this

19   case is not controlling on that ground.  It's also not

20   controlling on TILA grounds.

21         And even more importantly I would think, in later 5th

22   Circuit cases, the Plant v. Blazer case, allow setoff --

23   although not in bankruptcy, and I don't know what the

24   difference is, of TILA damages.  We cite this in our brief,

25   the 5th Circuit's decision in Plant v. Blazer Financial,

598 F.2d 1357 -- allows setoff of the TILA damages, but it says

you can't do them against attorneys' fees because -- and they

make a bunch of policy arguments about chilling the purpose of

the TILA statute.

Then you get to the 11th Circuit's decision in <u>Astrue</u>

<u>v. Ratliff</u>, if I can get it right, and they say that they don't

like very much the distinctions made in <u>Plant v. Blazer</u>.  They

think -- they criticize it.  And they say that even though it's

binding, they're not going to extend it out to the Equal Access

to Justice Act, which has a similar thing.  That's <u>Reeves v.</u>

<u>Astrue</u>.

And the Supreme Court in <u>Astrue v. Ratliff</u> said the

same thing, Equal Justice -- Equal Access to Justice Act, when

they said you can set off against the award and the attorneys'

fees, because they really just belong to the party and they're

subject to setoff like anything else.  And, yes, that might

chill the Equal Access to Justice Act, but that's a policy

argument to take to Congress, not for the courts to fix.  They

both make that very clear.

And the <u>Ratliff</u> case -- the <u>Reeves v. Astrue</u>, the

11th Circuit case, criticizes the analysis in the 5th Circuit

cases.  And they say, but that's a TILA case and we're going to

say that it's really based on the language of the TILA statute

that somebody owns it, the attorney somehow owns it, not the

plaintiff, and we're not going to extend it beyond TILA.  So

1  the 11th Circuit is signaling there that the policy arguments

2  that the courts adopted there shouldn't be extended out to

3  other cases like, in that case, the Equal Access to Justice

4  Act.

5          And in this district, we have two district courts

6  that have allowed counterclaims for the underlying debt.  Both

7  Judge Merryday and Judge Lazzara in the Stagg v. --

8          THE COURT:  Was that Bocelli?

9          MR. QUINN:  I'm sorry?

10          THE COURT:  Is one of those -- no that's a different

11  one.

12          MR. QUINN:  No.  It is Stagg v. Ford Motor Credit is

13  Judge Lazzara who relies on the Bakewell case and rejects these

14  policy arguments, saying, you know, they're policy

15  considerations.  But they say fairness to the defendant is also

16  a policy consideration.  Well, actually, he refers -- Judge

17  Lazzara cites the Bakewell case, a Georgia case, which allowed

18  the counterclaim for setoff to a FDCPA case.

19          THE COURT:  A counterclaim is different.  It was a

20  counterclaim for a separate judgment?

21          MR. QUINN:  No.  It's a counterclaim for the

22  underlying debt --

23          THE COURT:  Okay.

24          MR. QUINN:  -- in an action under their FDCPA case.

25          THE COURT:  And the judge allowed a setoff as opposed

 1  to allowing a separate judgment?

 2          MR. QUINN:  Right.

 3          MR. CENTRONE:  No, Your Honor.

 4          MR. QUINN:  Well, he allowed the counterclaims to go

 5  forward, Your Honor.  All these cases then dribble out after

 6  the counterclaims are allowed.  None of them get to judgment.

 7  There's motions to dismiss the counterclaim in <u>Stagg v. Motor</u>

 8  <u>Credit</u>, Judge Lazzara's case, arguing public policy grounds

 9  about the chilling effect, relying on the <u>Reed</u> decision.

10  Chilling effect if you allow setoff against these FCPA and

11  FDCPA cases, you'll chill -- attorneys won't want to do it;

12  you'll chill it.

13          He said, well -- he rejected that, said <u>Bakewell v.</u>

14  <u>Federal Financial Group</u>, a Georgia case 2006, is the

15  countervailing policies in favor of allowing the counterclaim

16  to go forward.  We attached part of that as Exhibit 1 to our

17  memorandum.  And as the <u>Bakewell</u> court put it, to put

18  defendant's counter -- to bar defendant's counterclaim would

19  favor one litigant's claim against the other.

20          And then <u>Thomas v. Commercial Recovery</u> case, Judge

21  Merryday, did the same thing, rejected -- the same public

22  policy arguments they're making here:  It's going to chill

23  FDCPA, FCPA cases if you allow setoff.

24          THE COURT:  Do you have a transcript?

25          MR. QUINN:  Of what?

1          THE COURT:  About -- of what the <u>Bakewell</u> court did.

2   Did the <u>Bakewell</u> court talk about the policy?

3          MR. QUINN:  The <u>Bakewell</u> court did, Your Honor.  I've

4   got the cite, I think, to <u>Bakewell</u>, 2006 WL 739807.  But I did

5   not attach it.

6          MR. CENTRONE:  Your Honor, all of those cases, none

7   of them deal with setoff.  All they deal is whether a

8   counterclaim is mandatory or permissive, that's it.  The setoff

9   policy is not addressed.

10          MR. QUINN:  Your Honor --

11          THE COURT:  And so you're saying that the district

12   court's are more concerned about having to spend time on a mere

13   permissive counterclaim as opposed to a compulsory

14   counterclaim?

15          MR. CENTRONE:  Exactly.  They have -- it has nothing

16   to do with setoff.  They don't address setoff at all.  It's

17   only whether a counterclaim is mandatory, compulsory, or

18   permissive.

19          THE COURT:  So the word "setoff" is not used in any

20   of those cases?

21          MR. CENTRONE:  I even did -- I did a find; I didn't

22   find it.

23          MR. QUINN:  Your Honor, counterclaim is the same

24   thing as a setoff only --

25          THE COURT:  Oh, no, it's different.

1          MR. QUINN:  -- offense instead of defense.

2          MR. CENTRONE:  It's very different.

3          THE COURT:  It's very different.

4          MR. QUINN:  And the arguments are made about the

5  chilling effect, which is what he's arguing here.  It's a

6  public-policy argument that they made that if you allow the

7  counterclaim instead of dismissing it as you can, you're going

8  to have a chilling effect.  And in each of these cases, they

9  allowed under the Fair Debt Collection Practices --

10         THE COURT:  Well, yeah.  I mean, the Fair Debt

11 Collection Practices Act doesn't say you don't have the right

12 to collect on the breach of contract claim.  It doesn't say

13 that at all.

14         MR. QUINN:  Exactly, Your Honor.

15         THE COURT:  And so the chilling effect argument,

16 that's out of context because the FDCPA and the FCCPA don't

17 preclude a reduction to judgment of the underlying debt at all.

18 And for someone to argue that the FCCPA means you can never

19 seek to collect your debt would just be specious and just flat

20 wrong.  And so I can see why the judges would rule that way.

21         MR. QUINN:  Your Honor, but the same analysis applies

22 under 553.  We can use it defensively here because of the same

23 reason.  There's nothing in the substantive law that says that

24 if you have committed one of these violations you still aren't

25 owed the money.  And 553 says --

```
 1            THE COURT:  You are still owed the money; I agree

 2  with that.  I'm not at all suggesting that inside of bankruptcy

 3  or outside bankruptcy that Chase is not entitled to pursue

 4  collection:  Inside of bankruptcy, via a proof of claim;

 5  outside of bankruptcy, via whether it's a counterclaim in the

 6  main action or it's a separate suit somewhere else.  That is

 7  not going to be the upshot of my ruling at all, at all.  This

 8  is solely limited to setoff, and that's why I'm interested in

 9  seeing what the setoff argument, how that's been played before

10  other courts.

11            MR. CENTRONE:  And, Your Honor, if I --

12            THE COURT:  And there's a dearth of case law out

13  there.

14            MR. QUINN:  Your Honor, most of it comes up in the

15  counterclaim area.  It's very rare that trustees in bankruptcy

16  are bringing these cases.  And we would say counterclaim and

17  setoff, the same substantive analysis goes forth:  Are we owed

18  an offsetting mutual debt?

19            THE COURT:  You're owed a debt.

20            MR. QUINN:  Can we use it defensively?

21            THE COURT:  Absent an objection to the claim.

22            MR. QUINN:  Can we use it defensively under 553?

23            THE COURT:  And that's the issue.  And that's the

24  case law I'm interested in.

25            MR. QUINN:  Your Honor, well, it's one case that we
```

1   know about where that express issue has come up is Judge May's

2   decision, and we did attach the ruling and his analysis, his

3   findings of fact and conclusions of law.  And we think they're

4   correct.  And we think the same ideas that Judge Merryday and

5   Judge Lazzara had is there's no reason to favor one over the

6   other.

7          THE COURT:  No.  That's a very different context.  I

8   disagree with you, Mr. Quinn.  I think whoever argued that to

9   them made an absurd argument to suggest that either of those

10  two statutory schemes meant that the collector couldn't collect

11  on the underlying debt.  So I can see --

12         MR. QUINN:  In the same proceeding.  And so what's

13  the difference here, Your Honor?  We're still owed the money.

14         THE COURT:  Oh, it's a very -- it's a big difference.

15  It's a big difference.

16         MR. QUINN:  Only a public-policy argument.  That's

17  all they have is public policy.  We shouldn't do it because

18  we'll chill them from bringing these cases.

19         THE COURT:  Okay.  And that's a different argument

20  than what was before the district court judges.  Okay.  I would

21  agree with them 100 percent that the counterclaim can be made

22  if it's outside of bankruptcy, the proof of claim may be

23  asserted if it's inside of bankruptcy.

24         Now the question is:  Do I permit some sort of an

25  internal mathematical adjustment be made and that's what setoff

1   is?  And so I just wanted to hear really what you had to say

2   about Newton because I'm familiar with these other cases.

3        MR. CENTRONE:  And, Your Honor, if I may?  The Newton

4   -- the Newton case and the Astrue case that Mr. Quinn cited,

5   those are two distinct lines dealing with two distinct issues.

6   They shouldn't be conflated quite that easily.  Newton, I think

7   Mr. Quinn is right that the issue is whether there's a penalty

8   involved.  And I think there is here, and we argued that in the

9   brief.

10        Now, as Your Honor put it, the FCCPA allows, quote-

11   unquote, "artificial damages," damages that aren't tied to harm

12   -- actual harm suffered by the debtor.

13        Number 2, the Astrue case and that line of cases deal

14   with mainly -- they deal exclusively with setoff of attorneys'

15   fees, which I think is a wholly different issue from the kind

16   of setoff that we're first talking about, which is setoff of

17   the damages, be they actual or statutory.

18        The Astrue line of cases are exclusively under the

19   Equal Access to Justice Act, which is a federal statute that

20   allows people to recover attorneys' fees if they were wronged

21   by a federal agency.  It's not a consumer protection statute,

22   unlike TILA, which is the Plant -- the Plant case was decided

23   under.

24        And the main distinction between the Astrue line of

25   cases and the Plant line of cases is that in Astrue there's a

1 statute -- a federal statute that says if you want to get

2 attorneys' fees from the government, you have to follow this

3 procedure, and it's talking to the plaintiff.  There's a

4 procedure that says submit your bills for your attorney.  And

5 this was key to the Supreme Court holding in the <u>Ratliff</u> case.

6 They treat attorneys like any other service provider.  I'm

7 paraphrasing, but that's the language they use.

8          Versus <u>Plant</u> where they're -- and TILA and FCCPA

9 where there is no statute similar to there.  And the court

10 looks at -- they looked at the language of the statute, said

11 that's no help.  So they looked at where is the money

12 ultimately going.  Who is ultimately -- not just nominally, who

13 is ultimately really getting the money?  And in <u>Plant</u> they held

14 it was the attorney because that's what it really is in these

15 kind of cases too.  Like I said, there is no statute related to

16 fee applications under the FCCPA.

17          Another important point, Your Honor, the <u>Astrue</u> line

18 of cases, they've only ever been cited in cases against the

19 federal government, where the federal government is a party,

20 except for two irrelevant cases where they were cited but not

21 for our purposes here today.  Otherwise, they've been cited

22 hundreds of times only in cases where the federal government is

23 a party.  And that's because when the federal government's a

24 party, statutes and the waivers of sovereign jurisdiction have

25 to be strictly construed.

1          Unlike here where we have consumer protection

2    statutes which are to be broadly construed for the protection

3    of the consumer, which is in the statute itself here.  In other

4    words, that line of cases is, frankly, just not relevant to

5    what we're doing here today.  It's the -- it's a whole --

6    wholly separate animal from what we're doing in these kinds of

7    consumer protection actions.

8          THE COURT:  All right.  Get your pen out, Ms. Chazal.

9          I'm going to rule against Mr. Quinn on the setoff

10   argument, on his Motion for Summary Judgment, and I'm going to

11   enter summary judgment in favor of the non-moving party, the

12   Plaintiff, as I am permitted to do under federal law.  And

13   here's why:

14         Principally -- principally three grounds, maybe four.

15   Number 1 is the Newton case.  I think that I must follow

16   Newton.  I'll go into more detail about why I think the FCCPA

17   and, although not before me, the FDCPA can be construed as

18   imposing penalties.

19         Number 2, setoff under Florida law has to exist in

20   favor of the defendant in the same right in which the defendant

21   is sued.  That's the essence of the mutuality requirement under

22   the Florida law of setoff.  And in this case, in this adversary

23   proceeding I should say, because the creditors allege debt to

24   the Debtor for the FCCPA violation, it's not the same or not

25   mutual with the Debtor's debt to the creditor on an underlying

1  credit card debt.  They're not in the same right.  They're two

2  very different causes of action.

3        I will cite here a case, <u>Carbajal</u>, C-a-r-b-a-j-a-l,

4  <u>v. Capital One</u>, 219 FRD 437, pinpoint cite 441, Northern

5  District of Illinois 2004:  An obligation that exists pursuant

6  to a liability imposed by a federal statute -- and of course in

7  this case they're talking about the FDCPA, but case law, as we

8  all know, under the FDCPA is instructional for purposes of

9  construing the FCCPA.

10        Anyway, going back to the quote:  That liability is

11  not held in the same capacity as a contractual debt.  And in

12  that case, defendants cite no authority for the proposition

13  that an entity liable for statutory damages for violating a

14  federal statute like the FDCPA would be entitled to offset

15  unrelated, let alone unmatured, debts.

16        All right.  In that case, apparently, the credit card

17  debt maybe was not in default.  I will cite the cases of <u>Coffin</u>

18  <u>v. Talbot</u>, 148 So. 184 at pinpoint cite 187, Florida Supreme

19  Court 1933:  Setoff must exist in favor of the defendant in the

20  same right in which the defendant is sued.

21        The same year, <u>Everglade Cypress Company v.</u>

22  <u>Tunnicliffe</u>, T-u-n-n-i-c-l-i-f-f-e, 148 So. 192 at pinpoint

23  cite 193, again Florida Supreme Court:  Mutuality of claims

24  means those claims existing between the same parties and in the

25  same right.

1          I will also cite, for whatever it's worth, <u>Rhodes</u>,

2  R-h-o-d-e-s, <u>v. Nicholas Financial, Inc.</u>  It's a case out of

3  the 12th Judicial Circuit in and for Manatee County, Florida.

4  It appears at 18 Florida Law Weekly Supp. 226b, "b" as in boy,

5  small "b."  And that's a 2010 decision in which Judge George

6  Brown, Jr., granted plaintiff's motion to strike the

7  defendant's affirmative defense of setoff, which was raised in

8  an FCCPA case.

9          Now, the reason I said, "for whatever it's worth," is

10  that this is the ruling in that case:  The defendant, Nicholas

11  Financial, Inc., is entitled to a setoff -- oh, the defense

12  stated, excuse me, this was the affirmative defense:  The

13  defendant, Nicholas Financial, Inc., is entitled to a setoff or

14  credit in an amount equal to the monies owed by the plaintiff

15  on the underlying account, which amount is presently

16  outstanding and unpaid.

17          The order struck that setoff defense.  Does not

18  contain any analysis or reason as to why the defense was

19  stricken.  However, it was stricken for being legally

20  insufficient because a motion to strike tests the legal

21  sufficiency of the defense.  So it had to have been deemed

22  legally insufficient.

23          As I said earlier, there's a dearth of case law on

24  this issue.  Let me go to the next reason.  And I will come

25  back to <u>Newton</u> at the end.  But let me go to the next reason.

1        If in fact these debts are capable of setoff and I'm

2   wrong in citing Coffin and Everglade and Carbajal and Judge

3   George Brown, Jr.'s case, then I have discretion to determine

4   whether setoff should be permitted.  And the discretion arises

5   if I conclude that the equities justify denying setoff, I can

6   deny it; if the equities justify my permitting it, I can permit

7   it.

8        But based on the public policy, which may be a fourth

9   reason -- that's why I said, "three, maybe four" -- I do think

10  that it would be inequitable to permit setoff when we're

11  talking about statutory violations of this type.

12       The policy argument is compelling to me, and I will

13  talk more about the policy.  But the statute says certain

14  things are not legal, meaning they are illegal.  And someone

15  who violates a statute should not be permitted to take

16  advantage of a setoff.  And it, in essence, can reward someone

17  who has taken illegal conduct -- excuse me -- taken illegal

18  action, and that is not fair.  It's not right.  It would be

19  inequitable.  So, on its face, to reward someone by giving them

20  a shortcut in the collection process when they have violated

21  the law, in my view, would be inequitable.

22       The fourth reason, the public policy, and maybe this

23  just is a different way of talking about inequitable concerns.

24  The public policy is meant to foster compliance with good

25  collection practices.  Bad collection practices are set out in

1  the statute scheme, the FCCPA and its federal father, the

2  FDCPA.

3        And if we allow setoff, then we don't incentivize

4  debt collectors to undertake good collection practices, and we

5  want to incentivize them to do the right thing.  The statute

6  has -- you can call it a penalty if you want -- the statute has

7  a monetary incentivizing mechanism, read penalty if you want on

8  that, that is meant to deter bad collection practices.  And if

9  we take away that incentive by allowing setoff, then who would

10  want to comply with the law?

11        Now, a second point about the public policy is that

12  it would discourage attorneys from acting as the private

13  attorneys general that this statutory scheme is meant to have

14  happen.  The government can't go out there and prosecute these

15  kind of claims, either in the criminal setting or the civil

16  setting.  There's just too small numbers, too many in volume.

17        And so the Florida Legislature basically made a

18  policy decision that says, look, we won't burden our government

19  with policing this statutory scheme.  We will encourage private

20  attorneys general to do that by including a mandatory

21  attorney's fee.  And if that's going to be subject to setoff as

22  well, well, then, the Gus Centrones of the world are never

23  going to take a case like this, and so therefore the cases will

24  never be brought and bad collection practices will never be

25  aired in a court of law.  And so I think that's a pretty

 1  compelling reason, the public policy, which may fold into the

 2  inequitable argument.

 3         And then getting back to Newton, based on what I said

 4  about the public policy and the monetary incentivizing

 5  mechanism in that statute, I think it does fit what Newton is

 6  talking about.  And if you get right down to it, Newton is

 7  really talking about the same thing as I mentioned as my fourth

 8  thing, which is the public policy.  It's not right to allow

 9  setoff -- to allow someone who has violated the law to escape

10  the consequences of the law.

11         So to summarize, Newton compels this decision.  This

12  monetary incentivizing scheme, this artificial damages or

13  penalty, should not be subject to setoff under Newton.

14         Number 2, setoff does not exist because the mutuality

15  element is lacking under Florida law.

16         Number 3, it would be inequitable to permit setoff

17  because it would allow people to take illegal action without

18  consequence.

19         And Number 4, in exercising the discretion, I also am

20  mindful of the very strong public policy behind the FCCPA and

21  its federal father, the FDCPA.  And in fact, in some senses,

22  perhaps the FCCPA is stronger because it says:  Take the

23  strongest penalties from both statutes and apply that, whatever

24  is the greater, that's what we want to have happen in Florida.

25             One moment.  I'm just going to read you something

else which I probably should have started with, but:  The FDCPA
is a federal law that was enacted to eliminate abusive debt
collection practices by debt collectors, to ensure that those
debt collectors who refrain from using abusive debt collection
practices are not competitively disadvantaged, and to promote
consistent State action to protect consumers against debt
collection abuses.  That's a quote from 15 United States Code,
Section 1692(e).

        The FDCPA is designed to encourage consumers and
attorneys to enforce compliance with the FDCPA by acting as
private attorneys general, cite Martinez v. Law Offices of
David J. Stern, P.A., In re Martinez, 266 B.R. 523 at pinpoint
cite 541, Bankruptcy Court, Southern District of Florida 2001.

        The FCCPA, modeled after its federal counterpart,
which I call its "federal father," also seeks to protect
Florida consumers from illegal and/or unscrupulous practices of
debt collectors and other persons, and I cite Schauer, S-c-h-a-
u-e-r, v. General Motors Acceptance Corp., 819 So.2d 809, at
pinpoint cite 811 to 812, Florida 4th DCA 2002.

        I could go on about the policy.  There's plenty of
other cases that do that, perhaps in greater detail than my
remarks today.

        My ruling does not mean that Chase cannot file a
proof of claim, that Chase cannot file a counterclaim for a
separate judgment if there is no bankruptcy stay that would

1  preclude that.  And my ruling does not mean that Chase could

2  not, absent this bankruptcy, have filed -- absent this

3  bankruptcy, Chase would not be prevented from filing a

4  counterclaim in state court for a separate judgment, or, if it

5  so chose, to file a separate suit for a separate judgment.

6          And the difference between allowing the counterclaim

7  but not the setoff is that internal mathematical adjustment

8  that I alluded to earlier, and that is that it's quite likely

9  that Chase is collectible and that the monetary incentivizing

10 mechanism would make Chase stop it if Chase is collectible and

11 Chase has to pay up.

12         On the other hand, it is quite possible that the

13 Debtor, absent bankruptcy, or the estate in a bankruptcy, does

14 not have money.  And so Chase's real return would be limited by

15 the circumstances of the Debtor/Defendant outside of bankruptcy

16 or the estate inside of bankruptcy.

17         Now, all of that hypothetical presupposes that I'm

18 even going to find a violation in this case, which we don't

19 know.  There's a dispute of fact on both of the -- of the

20 subsections that have been pleaded.  So perhaps I shouldn't

21 have ruled on summary judgment because there's no need to yet.

22 But you teed it up and it's here and I ruled on it.

23         And now I will do something for the second time

24 today, I will invite you to appeal.  I will invite you to

25 appeal on an interlocutory basis if you wish.  I would even,

with Mr. Centrone's willingness to join, I would even be

willing to advance this as a direct appeal request.  If we all

don't sign on, the likelihood is going to be zero that a direct

appeal request would be accepted.  And even if we do sign on,

the likelihood is still pretty slim.  Judge Wilson, Charles

Wilson, has stated in an informal forum that he believes that

the 11th Circuit gets benefit from hearing from the district

court as the intermediate appellate court.

But I'm willing to do whatever it is to get to bottom

on this so that there is settled law in the 11th Circuit that

is clear, that will guide the trustees or the plaintiffs'

attorneys outside of bankruptcy and the debt collectors, should

they be found in violation of either the FDCPA or the FCCPA,

because I think that everyone deserves settled law.  And if I

got it wrong, someone should tell me.  I don't think I got it

wrong.

That's not to say that Judge May got it wrong.  I

don't know what the facts were because each case is case-by-

case fact intensive on the equities.

I thought it was well briefed, and I thought the

arguments were very good.  And I think that both parties did

the best they could with almost complete absence of really very

helpful case law, so I appreciate your arguments.

Now, what I should do is have one of you, maybe you

can combine your efforts, one order, deny summary judgment on

1 the motion filed by the Plaintiff; deny summary judgment on the

2 motion filed by the Defendant; but enter summary judgment as to

3 the issue raised in the Defendant's motion in favor of the non-

4 moving party for the reasons stated orally and recorded in open

5 court that shall constitute the decision of the Court.

6      MR. QUINN:  I think I'll let Mr. Centrone take the

7 first crack at that, Your Honor.

8      MR. CENTRONE:  I'd be happy to take a crack at that

9 and pass it to Mr. Quinn.

10      THE COURT:  It could be simple.  Don't embellish it.

11 I may not be the most articulate judge in the whole courthouse,

12 but I think that my reasoning is -- someone can make sense out

13 of the transcript, I hope.  And I know both of you seeing me

14 eyeball to eyeball can fairly summarize it in whatever briefs

15 you choose to file in another court.

16      MR. QUINN:  Thank you, Your Honor.

17      THE COURT:  Thank you both.

18      MR. CENTRONE:  Thank you, Your Honor.

19      COURTROOM DEPUTY:  Is this set for trial?

20      THE COURT:  It is; probably in December or February.

21      MR. CENTRONE:  I think that's right.  I think it's a

22 ways out still.

23      COURTROOM DEPUTY:  Do you just want to cancel that

24 trial, as well?

25      THE COURT:  Pardon me?

```
 1              COURTROOM DEPUTY:  To cancel the trial.

 2              THE COURT:  We don't cancel the trial.  Mr. Quinn --

 3              COURTROOM DEPUTY:  Is that going to go?

 4              THE COURT:  Oh, yeah, there's a dispute of fact.

 5              MR. QUINN:  He hasn't won yet.

 6                          (Off the record)

 7              THE COURT:  All right.  We're going to go back on the

 8  record because Miss Garcia just checked the docket and, indeed,

 9  we're not set for trial and we need to be set for trial.  We've

10  got an amended answer, so we are at issue.  And I need to get a

11  sense from the parties when you all want to come together for

12  trial.  It's obvious you still need to do some discovery.

13              MR. CENTRONE:  Probably February, March.

14              MR. QUINN:  Well, whatever -- when's your next

15  opening a few months out anytime?

16              THE COURT:  Do you want a half a day?

17              MR. QUINN:  A half day would be plenty, Your Honor.

18              COURTROOM DEPUTY:  December 14th, 9:30.

19              THE COURT:  December you said?

20              COURTROOM DEPUTY:  Yes.

21              THE COURT:  December 14th, 9:30.

22              COURTROOM DEPUTY:  And we're not going to do another

23  summary judgment day.

24              THE COURT:  No, because we just did that.

25              COURTROOM DEPUTY:  Okay.
```

1          MR. QUINN:  Yes, we did.

2          COURTROOM DEPUTY:  I just wanted make sure because

3   it's going to say "not applicable."

4          THE COURT:  It's going to say "not applicable."  That

5   blank you don't fill in a deadline.  No more summary judgments.

6          All right.  Thank you.

7          MR. CENTRONE:  Thank you, Your Honor.

8          MR. QUINN:  Thank you.

9               (Hearing concluded at 4:51 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

STATE OF FLORIDA            )

COUNTY OF HILLSBOROUGH    )

            I, MARILYN L. TAYLOR , Official Court Reporter
and Notary Public, do hereby certify:

            That the foregoing hearing was reported by me at that
time and place therein designated; and that the foregoing pages
were transcribed by me and constitute a true and correct copy
of the stenomask report.

            I FURTHER CERTIFY that I am not a relative, employee,
attorney or counsel of the parties, nor a relative or employee
of such attorney or counsel, nor financially interested in the
foregoing action.

            BE IT KNOWN that I shall not attest to the accuracy
nor content of any other than the original transcription herein
set forth, excepting copies that are made by me by whatever
means, containing my original signature only.

            WITNESS my hand and seal this 18th day of July 2011,
in the City of Tampa, Hillsborough County, Florida.


            Marilyn L. Taylor, CVR
            Certified Verbatim Reporter
            Notary Commission No.EE004088
            Expires: October 25, 2014